## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD GRAZIANO, | : | Civil No. 1:24-CV-01084 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ROSS MILLER, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court are two motions seeking to dismiss the operative complaint in this matter filed by Defendants and a motion seeking to amend the complaint filed by Plaintiff.  (Docs. 14, 16, 29.)  For the following reasons, the court will grant Plaintiff's motion to amend, deny the motions to dismiss as moot, and screen the proposed amended complaint.

### BACKGROUND AND PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint in July of 2024.  (Doc. 1.)  This complaint raised constitutional challenges against thirteen defendants regarding the following four separate events at SCI-Camp Hill: (1) the removal of Plaintiff's Z-Code, or single cell, status; (2) a fabricated misconduct report; (3) the confiscation of his personal property; and (4) being called a "rat" by staff.  (Doc. 1.)  Plaintiff was granted leave to proceed in this action *in forma pauperis*, and the complaint was served on the named defendants.  (Doc. 8.)

1

Following service on the parties, all Defendants filed motions to dismiss. (Docs. 14, 16.)  After several motions for an extension of time, rather than filing a brief in response, Plaintiff filed a motion for leave to amend his complaint stating that he believed that the defects set forth in his previous complaint could be remedied with the proposed amended complaint.  (Doc. 29.)  Defendant Wanga filed a brief in opposition to Plaintiff's motion to amend.  (Doc. 29.)

## JURISDICTION AND VENUE

The court has jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.  Venue is proper in this district because the alleged acts and omissions giving rise to the claims occurred at SCI-Camp Hill in Cumberland County, which is located within this district.  *See* 28 U.S.C. § 118(b).

## STANDARD

Under 28 U.S.C. § 1915(e)(2)(B)(ii), a court "shall dismiss" an *in forma pauperis* case "at any time if the court determines that . . . the action . . . fails to state a claim upon which relief may be granted[.]"  The legal standard for dismissing a complaint for failure to state a claim pursuant to 28 U.S.C. § 1915 is identical to the legal standard used when ruling on Fed. R. Civ. P. 12(b)(6) motions

to dismiss.  *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109-10 & n.11 (3d

Cir. 2002).

In order "[t]o survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting

*Twombly*, 550 U.S. at 556).

Under Rule 12(b)(6), the court must accept all well pleaded allegations as

true and construe all reasonable inferences in favor of the nonmoving party.  *Doe*

*v. Univ. of the Scis.*, 961 F.3d 203, 208 (3d Cir. 2020).  The pleadings of self-

represented plaintiffs are held to a less stringent standard than formal pleadings

drafted by attorneys and are to be liberally construed.  *See Erickson v. Pardus*, 551

U.S. 89, 94 (2007); *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d. Cir. 2011).  Self-

represented litigants are to be granted leave to file a curative amended complaint

even when a plaintiff does not seek leave to amend, unless such an amendment

would be inequitable or futile.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224,

245 (3d Cir. 2008).

**DISCUSSION**

As discussed above, the court will grant Plaintiff's motion to amend the complaint and deny the pending motions to dismiss as moot. However, the court will screen the proposed amended complaint pursuant to 28 U.S.C. § 1915.

**A. Alleged Facts in the Proposed Amended Complaint**

In the proposed amended complaint, Plaintiff raises facts concerning four separate occurrences at SCI-Camp Hill. (Doc. 29-2.) Plaintiff names the following twelve defendants, the majority of which are employed at SCI-Camp Hill: (1) Ross Miller ("U/M Miller"), unit manager; (2) Douglas Dickey ("Dickey") Corrections Officer 3/Security Lieutenant; (3) Debora Alvord ("Alvord"), administrative officer/superintendent's assistant; (4) Erin Miller ("CC Miller"), a Corrections Counselor; (5) Laurel H. Harry ("Harry"), Facility Manager/Superintendent; (6) Elicia Stein ("Stein"), Licensed Psychology Manager; (7) Melissa Howdyshell ("Howdyshell"), Psychological Service Specialist; (8) Kevin Wanga ("Wanga"), Mental Health Provider; (9) Chad Benning ("Benning"), Corrections Officer 1/RHU Property Officer; (10) George Little ("Little"), Acting Secretary of the Department of Corrections; (11) James Kehoe ("Kehoe"), Unit Manager; and (12) the Department of Corrections ("DOC"). (*Id*., pp. 2–4.)[1] Plaintiff alleges that during his time at SCI-Camp Hill,

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

he filed numerous grievances against Defendants and other staff members and that the staff at SCI-Camp Hill dislike him and treated him with bias and open hostility. (*Id.*, p. 5.)  Plaintiff alleges that while he was housed at SCI-Forest, he filed two lawsuits against Defendant Dickey and other DOC employees at SCI-Forest.  (*Id.*, p. 6.)  Plaintiff alleges that while at SCI-Forest, he was granted a legal property exemption permitting him to possess three extra records center boxes containing excess legal materials for active cases.  (*Id.*, p. 7.)

Plaintiff alleges that he was transferred from SCI-Forest to SCI-Camp Hill on July 1, 2021 by Defendant Dickey out of retaliation for the lawsuits.  (*Id.*, pp. 6–7.)  At that time, those three extra boxes were shipped via UPS to SCI-Camp Hill on June 30, 2021.  (*Id.*, p. 7)  Included in one of the boxes was a draft of a civil rights complaint Plaintiff intended to file in the Western District of Pennsylvania against several DOC employees at SCI-Forest, including Defendant Dickey.  (*Id.*)

Plaintiff states that on July 12, 2021, he was summoned to the Security Office for property pick-up.  When he arrived, Defendant Dickey told him that one of the boxes he had shipped to SCI-Camp Hill had broken open during shipping, and he was handed a new record box that Defendant Dickey said contained the contents of the box that allegedly broke open.  (*Id.*, p. 8.)  Plaintiff alleges that when he inspected the paperwork, he realized that nearly half the paperwork in the

box was gone, including the civil rights complaint draft. (*Id.*) Plaintiff asked Defendant Dickey regarding the missing legal paperwork from the broken box and the other two boxes shipped and asked Defendant Dickey to issue him a property receipt. (*Id.*) Plaintiff alleges that Defendant Dickey stated that he did not know the whereabouts of his missing paperwork or the other two boxes he had shipped. (*Id.*) Defendant Dickey gave Plaintiff a property receipt, stating "I guess I better do so because I don't want you to make me a Defendant in any more lawsuits." (*Id.*, p. 8–9.) Plaintiff then asked if he had to worry about continued retaliation, and Defendant Dickey stated, "I mean if you keep filing paperwork, you know how that goes." (*Id.*, p. 9.) Plaintiff alleges that in July of 2021, he had a friend contact the UPS, who verified that three boxes were delivered to SCI-Camp Hill on July 2, 2021. (*Id.*) Plaintiff alleges that he filed a grievance detailing these facts on August 1, 2021. (*Id.*)

More generally, Plaintiff alleges that Defendants Dickey, U/M Miller, CC Miller, Alvord, Stein, Wanga, Kehoe, Howdyshell, and Benning "regularly treated Plaintiff with discrimination and hostility because Plaintiff lodged numerous verbal and written complaints against them threatening litigation." (*Id.*, p. 6.)

Next, Plaintiff alleges that on August 6, 2021, the prisoners who were not vaccinated, including himself, were moved to isolation and restricted from all communal areas outside of I-Block. (*Id.*, p. 10.) Because of the restriction, if

unvaccinated prisoners wanted photocopies, they had to fill out a request slip stating their photocopy request, provide a cash slip to cover the cost of the photocopies, and give their request and cash slip to their assigned unit counselor who would then deposit the order into the library's mailbox. (*Id.*) The librarian would then process the order and deposit the completed order into the I-Block's mailbox. (*Id.*) The counselor would then deliver the order to the requesting prisoner personally. (*Id.*)

Plaintiff alleges that he redrafted the missing civil rights complaint and gave it to his unit counselor Defendant CC Miller with a request for photocopies on September 8, 2021. (*Id.*) On September 14, 2021, Defendant CC Miller returned his photocopy order excluding the original and copies of the civil rights complaint and she then denied responsibility for the missing documents telling Plaintiff to ask the librarian what had happened. (*Id.*, pp. 10–11.) Plaintiff further alleges that on October 14, 2021, he gave Defendant U/M Miller a request for photocopies containing 16 pages of legal documents including a list of all unvaccinated prisoners housed on I-Block who had agreed to be witnesses in the civil rights complaint Plaintiff planned to file. (*Id.*, p. 11.) Plaintiff alleges that he never received those photocopies or recovered the documents he gave to Defendant U/M Miller. (*Id.*) When he asked Defendant U/M Miller about his photocopy orders, Defendant U/M Miller "became enraged and charged towards Plaintiff until he

came face-to-face within inches" of Plaintiff's face and yelled "[b]ug the librarian about your copies, I am not responsible for your copies! . . . so get the fuck out of my face!" (*Id*.) On December 16, 2021, the librarian provided Plaintiff with two confiscated items receipts for the missing documents and listed them as "Questionable litigation against Lt. Dickey and other correctional staff" and "Inmate Graziano sent documents to the library to be photocopied. Inside his envelope he had two call lines, one with inmate names & numbers. One with inmate names." (*Id*., pp. 11–12.) Plaintiff then filed a grievance concerning the retaliatory confiscation of legal documents, which was denied on the ground that staff provided Plaintiff with the requested copies. (*Id*., p. 12.)

Plaintiff alleges that he made a third draft of the civil rights complaint naming Defendants Dickey and other DOC employees and he joined Defendants U/M Miller and CC Miller in the complaint for their personal involvement in the confiscation of the second draft of the complaint and other legal documents. (*Id*., pp. 12–13.) On April 8, 2022, Defendant U/M Miller photocopied this third draft of the civil rights complaint free of charge, unaware that Plaintiff had named him and CC Miller as Defendants in the complaint. (*Id*., p. 13.) Defendant U/M Miller became aware of the addition when he copied the complaint, because when he returned with the copies, he stated "You're suing us too? . . . Really?" and "I should charge you for those damn copies." (*Id*.) Plaintiff then filed the complaint

8

in the United States District Court for the Western District of Pennsylvania on April 22, 2022 under the caption of *Graziano v. PA DOC, et al.*, No. 1:22-cv-00163-RAL. (*Id*., p. 13.)

Next, Plaintiff alleges that on July 22, 2022, he met with Defendants CC Miller and U/M Miller and they told him that they were taking his single cell status, i.e. his Z-Code status, and had already initiated the vote sheet for that purpose. (*Id*., p. 14.) Plaintiff informed Defendants CC Miller and U/M Miller that the taking of his Z-Code status would pose a danger because he cannot cope with sharing a cell with another person. (*Id*.) Plaintiff alleged that Defendants U/M Miller, CC Miller, Howdyshell, Stein, and Wanga were aware of his mental health vulnerabilities posing a substantial risk of serious harm to Plaintiff and any inmate housed in his cell. (*Id*., p. 15.) Specifically, Plaintiff alleges that he shared his mental health challenges concerning a cellmate with Defendants Howdyshell, Stein, and Wanga in February of 2022. (*Id*., pp. 15–16.)

Plaintiff alleges that the July 28, 2022 order granting *in forma pauperis* status from the Western District that directed the Superintendent of SCI-Camp Hill to remit payment from his account put the personnel at SCI-Camp Hill on notice that Plaintiff had filed a civil action against the DOC and Defendants U/M Miller, CC Miller and Dickey. (*Id*., p. 14.)

Plaintiff alleges that he filed a grievance on August 6, 2022 to prevent Defendants U/M Miller and CC Miller from taking his Z-Code status. (*Id.*, p. 17.) Plaintiff further states that on August 24, 2022, his mother sent a letter to George Little, the former acting Secretary of Corrections asking that he intervene to prevent Defendants CC Miller and U/M Miller from taking Plaintiff's Z-Code. (*Id.*, pp. 17–18.) Plaintiff alleges that on August 26, 2022, he again attempted to dissuade Defendants CC Miller and U/M Miller from taking his Z-Code, stressing that he was having nightmares and severe anxiety from the fear of double-celling. (*Id.*, p. 19.) Plaintiff alleges that Defendant U/M Miller stated that if he refused double-celling or acted violently towards any cellmate, he would be sent to the Restricted Housing Unit ("RHU") and then told Plaintiff that if he dropped Defendants Dickey, CC Miller, and U/M Miller from his lawsuit, they would let him retain his Z-Code. (*Id.*) Plaintiff alleges that Defendant CC Miller stated that they had "garnered unanimous support in favor of taking Plaintiff's z-code 'from all the friends [Plaintiff] made writing grievances," and stated that he had filed approximately 43 grievances at SCI-Camp Hill by August of 2022 with the majority of those grievances being filed against Defendants U/M Miller and CC Miller addressing conditions of confinement and problems with staff. (*Id.*, pp. 19–20.) Plaintiff alleges that Defendant U/M Miller and CC Miller were aware of his

grievances and his litigation because he went through those Defendants to make photocopies. (*Id.*, p. 20.)

Plaintiff alleges that on September 1, 2022, he had an appointment with Defendants Howdyshell and Stein, and they discussed his ongoing mental health issues. (*Id.*, pp. 20–21.) Later that afternoon, Plaintiff was escorted to the medical department and was examined for self-mutilation. (*Id.*, p. 21.) When self-mutilation was found, Plaintiff was taken to a Psychiatric Observation Cell ("POC") for the night. (*Id.*)

Plaintiff alleges that on September 2, 2022 he was brought before an incomplete quorum of the Psychiatric Review Team ("PRT") which excluded Defendant Stein, but including Defendant Wanga, and was asked whether he had any plans or thoughts of killing or hurting himself. (*Id.*, p. 22.) Plaintiff stated he did not. (*Id.*) Plaintiff alleges that he was housed in a POS through September 6, 2022. (*Id.*) Plaintiff states that Defendant Wanga saw him on September 6, 2022 at the POC, and they discussed double celling. (*Id.*) Plaintiff repeated that he had a tendency to be hostile towards cellmates. (*Id.*) Plaintiff states that Lieutenant Ellsworth told Defendant Wanga that he was also concerned that Plaintiff would be unsafe in a double cell. (*Id.*, p. 23.) That same day, Plaintiff lost his Z-Code status and was assigned to general population in a double cell. (*Id.*, pp. 23–24.)

When Plaintiff learned of the loss of his Z-Code status, he allegedly became "frantic." (*Id.*, p. 24.) He was called into Defendant Kehoe's office, and Plaintiff informed him that he was in distress about double celling and asked him to assign him a temporary Z-Code. (*Id.*) Defendant Kehoe told Plaintiff that he had no vacant cells to house Plaintiff by himself and that if he refused to double-cell he would be placed in the RHU. (*Id.*) Plaintiff alleges that he then submitted to double-celling with the first cellmate, but could not sleep and he was moved to a vacant cell. (*Id.*, pp. 24–25.)

Plaintiff alleges that on September 13, 2022, he was assigned the second cellmate. (*Id.*, p. 25.) He states that he did not sleep, and the second cellmate was moved out of the cell. (*Id.*)

On October 20, 2022, he was assigned a third cellmate who had just been released from the RHU. (*Id.*) Plaintiff alleges that the next day in the early morning, the third cellmate gipped and pulled on his ankles, which he believed was an interaction with a demonic entity. (*Id.*, p. 26.) The interaction escalated into a violent scuffle resulting in him sustaining injuries to his face, head, chest, and rib. (*Id.*) On October 21, 2025, the third cellmate reported the scuffle to Defendant Kehoe. (*Id.*) Defendant Kehoe then confronted Plaintiff about the fight, and Plaintiff admitted to the fight, stating it was unsafe for him and the third cellmate to continue double celling. (*Id.*, pp. 26–27.) Plaintiff alleges that he was told by

12

Defendant Kehoe that the two could not be separated until after the upcoming weekend. (*Id*., p. 27.) Plaintiff alleges that he told Defendant Kehoe that he was putting his life and the life of the third cellmate in danger by keeping them in the same cell. (*Id*.) Plaintiff then requested to be placed in POC, which he was that same day. (*Id*., p. 28.) Plaintiff then alleges that he engaged in self-inflicted harm. (*Id*.)

Plaintiff alleges that an October 24, 2022[2], he was transferred from the POC at the infirmary to the POC in RHU and given a misconduct for threatening the third cellmate. (*Id*.) Plaintiff alleges that this misconduct misrepresents his conversations with Defendant Kehoe. Plaintiff was found guilty of the misconduct and sentenced to thirty days in disciplinary custody because the Hearing Examiner chose to believe Defendant Kehoe's version of events. (*Id*., p. 29.)

On November 7, 2022, Plaintiff was released from the RHU back to general population, and Defendant Kehoe assigned him to a cell with a fourth cellmate. (*Id*., pp. 29–30.) Plaintiff alleges that he continued to suffer mental health symptoms, and the fourth cellmate filed a grievance complaining about Plaintiff's behavior. (*Id*., p. 30.) On November 30, 2022, Plaintiff was placed in the RHU and issued another misconduct changing him with fighting with allegations that

---

[2] The court assumes the correct date is 2022 and the use of 2024 in Plaintiff's proposed amended complaint is a typo.

there was camera footage showing Plaintiff and another prisoner exchanging blows with closed fists.  (*Id*.)  Plaintiff was found not guilty of this misconduct on December 12, 2022 because the video did not show what was alleged.  (*Id*., pp. 30–31.)  Members of the PRC kept him in administrative segregation for about sixty-one days before transferring him to SCI-Mahanoy on January 31, 2023.  (*Id*., p. 31.)  On February 9, 2023, Plaintiff's Z-Code status was reinstated.  (*Id*.)

Plaintiff further alleges that on September 1, 2022, Defendant U/M Miller had officers pack his personal property and store it in I-Block after Plaintiff was placed in the POC.  (*Id*., p. 32.)  He alleges that Defendant Wanga had his release date from the POC changed from September 2, 2022 to September 6, 2022 to give Defendant Dickey time to have Plaintiff's personal property searched and not based on a legitimate mental health concern.  (*Id*.)  On September 7, 2022, Defendant Dickey had Plaintiff come to the security office to pick up his personal property.  (*Id*.)  Plaintiff states that he did not accept the receipt of his personal property because it looked incomplete and Defendant Dickey refused to let Plaintiff inventory the property on-site in order to determine whether it was all there.  (*Id*., p. 33.)  Plaintiff filed four grievances to recover his property.  (*Id*., pp. 33–34.)  Plaintiff states that at all relevant times, he had a legal property exemption to possess three extra records center boxes for legal materials for his active cases.  (*Id*., p. 34.)  Despite this, he alleges that when he was shown his boxes, none of

14

them had the legal property exemptions taped to them, but there was evidence that tape had been adhered to the box and removed. (*Id*.) Plaintiff alleges that when he did an inventory of his property, there was property missing. (*Id*., p. 35.) Plaintiff alleges that Defendants Dickey, U/M Miller, and Alvord removed the legal property exemptions from the boxes in an attempt to dispose of these three boxes. (*Id*.) Plaintiff alleges that he spoke with Defendant Benning about the additional boxes and the disputed legal property exemption. (*Id*., pp. 36–37.) He states that the two agreed for Defendant Benning to place the three extra boxes in facility storage while Plaintiff verified his legal property exemption, but despite this conversation, Defendant Benning confiscated the three extra boxes. (*Id*., pp. 37–38.) Plaintiff also alleges that Defendant Alvord was the individual who told Defendant Benning that Plaintiff did not have a legal property exemption despite her assisting Plaintiff in obtaining the legal property exemption originally. (*Id*., p. 40.) Plaintiff states that this legal property deprivation caused frustration and stress in his pending cases. (*Id*.) Specifically, he alleges that his status conferences in his civil actions had to be postponed. (*Id*., p. 43.) Plaintiff alleges that by the postponed status conference on January 30, 2023, he still did not have his property and this "prevented Plaintiff from litigating his case." (*Id*., p. 44.)

On January 31, 2023, Plaintiff was transferred to SCI-Mahanoy without the three extra boxes. (*Id*.) Plaintiff obtained an injunction from state court for the

return of the boxes. (*Id*., pp. 44–45.) Plaintiff's March 20, 2023 hearing in state court had to be continued because Defendants Dickey and Harry did not comply with the state court's order. (*Id*., p. 45.) On August 4, 2023, the state court held Defendants Dickey, Harry, and the other defendants in contempt of the injunction and deferred judgment. (*Id*.) Following multiple letters to SCI-Camp Hill and Defendants, Plaintiff received his three extra boxes on September 28, 2023 with some records missing. (*Id*., pp. 45–47.) Some records were confiscated and sealed, and remain sealed. (*Id*., pp. 47–48.) Plaintiff stated that the confiscation of property resulted in "unfavorable court rulings in that case and caused Plaintiff to file at least nine requests for enlargement of time on 11/04/2022; 12/01/2022; 12/19/2022; 01/24/2023; 03/17/2023; 05/01/2023; 06/26/2023 and 10/12/2023." (*Id*., p. 50.)

Based on these alleged facts, Plaintiff is raising: First Amendment retaliation claims against Defendants U/M Miller, CC Miller, Dickey, Benning, Alvord, Harry, Howdyshell, DOC and Kehoe; Eighth Amendment deliberate indifference claims against U/M Miller, CC Miller, Howdyshell, Stein, Wanga, Kehoe, Little Harry, the DOC and Dickey; Fourteenth Amendment Deprivation of Property without due process against Defendants Dickey, U/M Miller, CC Miller, Alvord, Benning, Harry, and the DOC; conspiracy to deprive Plaintiff of his property against Defendants Dickey, CC Miller, U/M Miller, Alvord, Benning, Harry, and

the DOC; conspiracy to take Plaintiff's Z-Code against Defendants U/M Miller, CC Miller, Howdyshell, Wanga, Stein, Little, Dickey, and Harry; negligence against U/M Miller, CC Miller, and Howdyshell; and Intentional Infliction of Emotional Distress against all Defendants.  (*Id.*, pp. 53–56.)

### B. Loss of Z-Code Status

#### 1. Eighth Amendment Claims

Plaintiff brings an Eighth Amendment deliberate indifference claim against Defendants U/M Miller, CC Miller, Dickey, Benning, Alvord, Harry, Howdyshell, Kehoe, and the DOC based on the loss of his Z-Code status and the failure to reinstate the Z-Code status.  (Doc. 29-2, p. 53.)

There is "no constitutional right to be assigned a particular stability code, or to be confined in a particular cell."  *Stafford v. Corizon Health, Inc*, No. 1:15-CV-2333, 2016 WL 4191764, at *6 (M.D. Pa. Aug. 9, 2016) *citing Rhodes v. Chapman*, 452 U.S. 337 (1981); *Hodges v. Wilson*, 341 Fed. Appx. 846, 846 (3d Cir. 2009).  "It is well established that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). Likewise, "the denial of Z-code status, by itself, is not cruel and unusual punishment and does not rise to the level of an Eighth Amendment violation." *Mattis v. Dep't of Corr.*, No. 16-0306, 2017 WL 6406884, at *12 (W.D. Pa. Dec. 15, 2017) *citing Gellock v. Prison Health Servs., Inc.*, No. 07-8, 2009 WL

2038235, at *8 (W.D. Pa. July 8, 2009).  Therefore, generally, the loss of

Plaintiff's Z-Code status alone does not violate the Eighth Amendment.

However, Plaintiff alleges that the loss of the Z-Code status resulted in him

being housed with cellmates on four separate occasions.  (Doc. 29-2, pp. 20–31.)

Plaintiff further alleges that there was a violent exchange between him and his

third cellmate resulting in injuries to his face, head, chest and rib.  (*Id.*, p. 26.)

Additionally, he alleges that prior to the loss of his Z-Code status, he informed

Defendants U/M Miller, CC Miller, Howdyshell, Stein, and Wanga that his mental

health vulnerably posed a substantial risk of serious harm to Plaintiff and any

inmate housed in his cell.  (*Id.*, pp. 15, 22–23.)  Plaintiff alleges that despite

providing this information, Defendants U/M Miller, CC Miller, Howdyshell, Stein,

and Wanga were involved in the vote to remove his Z-Code status.  (*Id.*, p. 23.)

Therefore, Plaintiff is alleging more than just the loss of his Z-Code status.  He is

alleging that the loss of Z-Code status put him in known danger resulting in an

injury.

"A prison official's 'deliberate indifference' to a substantial risk of harm to

an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825,

828 (1994).  "[P]rison officials have a duty . . . to protect prisoners from violence

at the hands of other prisoners."  *Id*. at 833 (citations omitted).  "It is not, however,

every injury suffered by one prisoner at the hands of another that translates into

constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834.

The Supreme Court has found that an Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." *Id.* Furthermore, in cases involving prison safety or prison conditions, the relevant state of mind "is one of 'deliberate indifference' to inmate health or safety." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 130 (3d Cir. 2001). This deliberate indifference standard "is a subjective standard under *Farmer*-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." *Id.* Thus, "[d]eliberate indifference can be shown when a prison official *knows of and disregards* an excessive risk to inmate health or safety." *Hamilton v. Leavy,* 117 F.3d 742, 747 (3d Cir. 1997) (emphasis added).

Under this standard, those involved in the loss of Z-Code status that were aware of the potential for a violent outburst by Plaintiff if double celled may be liable under the Eighth Amendment for the injuries suffered from the fight with the third cellmate. Therefore, the Eighth Amendment claim raised against Defendants U/M Miller, CC Miller, Howdyshell, Stein, and Wanga will survive screening.

Plaintiff makes similar allegations concerning Defendant Kehoe. Essentially, he alleges that when he was moved into general population, he was housed in Defendant Kehoe's unit, that he informed Defendant Kehoe that he was prone to violence when double celled due to his mental health condition, and that Defendant Kehoe denied his request for emergency Z-Code status. (Doc. 29-2, pp. 24–25.) However, Plaintiff alleges that Defendant Kehoe relied on a phone call with Defendant U/M Miller and was informed that Plaintiff's Z-Code status was removed following a vote by the PRT team, which included medical professionals. (*Id.*, p. 24.) The Third Circuit has found that non-medical prison officials can defer to the medical judgment of an inmate's treating physicians. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). Therefore, any Eighth Amendment claim stemming from the loss or refusal to reinstate Plaintiff's Z-Code against Defendant Kehoe will be dismissed with prejudice.

Plaintiff does not allege that Defendants Dickey, Benning, Little, and Harry had any personal involvement in the removal of his Z-Code status. To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). It is also well established that "[a]

20

defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *See Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007).  Since Plaintiff did not allege any personal involvement on the part of these Defendants, any claim associated with the loss of Plaintiff's Z-Code status will be dismissed against Defendants Dickey, Benning, Little, and Harry without prejudice.

Plaintiff also raises this claim against the DOC.  (Doc. 29-2, p. 53.)  It is well-settled that neither a state nor its agencies, are considered a "person" as that term is defined under § 1983 and, therefore, are not subject to a § 1983 suit.  *Hafer v. Melo*, 502 U.S. 21, 25–27 (1997).  Therefore, the DOC is not a "person" within the meaning of 42 U.S.C. § 1983.  Thus, Plaintiff's Eighth Amendment claim against it will be dismissed with prejudice.

To the extent that Plaintiff is asserting that his repeated placement in POC or administrative segregation due to his interactions with his cellmates constitutes an Eighth Amendment violation, the court will dismiss such claims.  The crux of Plaintiff's amended complaint is that he cannot be housed with a cellmate.  (Doc. 29-2.)  Therefore, any assertion that single celling violated his constitutional rights–without more–is inconsistent with the alleged facts.

### 2. Due Process Claims

While Plaintiff does not specifically raise any due process claims associated with the loss of his Z-Code status, he implies that Defendants did not follow proper procedure in removing his Z-Code status: "Defendant U/M Miller and CC Miller initiated a DC-46, Vote Sheet to take Plaintiffs Z-Code which they got Defendant Howdyshell, Stein and Wanga to endorse by vote via said DC-46 Vote Sheet, and/or via DC-97, Mental Health Referral, in order to legitimize and disguise their retaliatory motives for initiating such." (Doc. 29-2, pp. 22–24.) In the event that the amended complaint can be construed to bring a Fourteenth Amendment claim, it will also be dismissed with prejudice.

"An inmate does not have a protected liberty interest arising from the Due Process Clause to be assigned to a particular custody level, security classification, or place of confinement." *Anderson v. Dohman*, No. 3:18-CV-1741, 2019 WL 1546943, at *4 (M.D. Pa. Apr. 9, 2019) *citing Wilkinson v. Austin*, 545 U.S. 209, 221– 22 (2005) (finding that the Constitution does not give rise to liberty interest in avoiding transfers to more adverse conditions of confinement); *also citing Thomaston v. Meyer*, No. 12-4563, 519 Fed. Appx. 118, 2013 WL 2420891 (3d Cir., Jun. 5, 2013) (holding that denial of inmate's request for Z code status is not a deprivation of a protected liberty interest).

### 3. Retaliation Claims

Plaintiff raises a general First Amendment retaliation claim which could be associated with both the loss of Plaintiff's Z-Code status and the confiscation of Plaintiff's property.  (Doc. 29-2, p. 53.)  Therefore, the court initially addresses the First Amendment retaliation claim for the loss of his Z-Code status.

While the loss of Z-Code status does not rise to a constitutional violation itself, it can still constitute retaliation.  It is well settled that prison officials may not retaliate against an inmate because he exercises his right of access to the courts. *Fantone v. Latini*, 780 F.3d 184, 191 (3d Cir. 2015).  A prisoner asserting a retaliation claim must allege the following elements: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.  *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *see also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003).  The filing of a lawsuit or a prison grievance constitutes protected activity under the First Amendment. *Fantone*, 780 F.3d at 191.

Here, Plaintiff alleges that Defendants U/M Miller, CC Miller, and Howdyshell were aware that they were defendants in a civil action filed in the Western District of Pennsylvania and the subject of multiple grievances and that

23

they took action to have his Z-Code status removed out of retaliation for the civil action and the grievances. (Doc. 29-2, pp. 6, 12–20.) Therefore, retaliation claims against Defendants U/M Mill, CC Miller, and Howdyshell will be allowed to proceed to discovery.

### 4. Conspiracy

Under his list of legal claims, Plaintiff raises a conspiracy to remove his Z-Code status claim against Defendants U/M Mill, CC Miller, Howdyshell, Wanga, Stein, Little, Dickey, and Harry. (Doc. 29-2, pp. 55.) As discuss above, there is "no constitutional right to be assigned a particular stability code, or to be confined in a particular cell." *Stafford*, 2016 WL 4191764, at *6 *citing Rhodes*, 452 U.S. at 337; *Hodges*, 341 Fed. Appx. at 846. Since the removal of the Z-Code status is not a constitutional violation, the court cannot find liability for the conspiracy to remove it. As such this claim is dismissed with prejudice.

### C. Loss of Property

Plaintiff's amended complaint also details two specific instances involving the loss of his legal property. (Doc. 29-2.) The first incident addresses the loss of legal property following his transfer from SCI-Forest to SCI-Camp Hill and the loss of a civil rights complaint for an action filed in the Western District of Pennsylvania. (*Id.*, pp. 7–13.) The second focuses on the confiscation of three boxes of legal property while housed at SCI-Camp Hill. (*Id.*, pp. 32–44.)

### 1. First Amendment Access to Court Claim

Plaintiff does not specifically raise a First Amendment access to court claim in his list of legal claims.  (Doc. 29-2, pp. 53–56.)  However, he alleges that in both confiscation of property events identified in the complaint, the confiscation interfered with the progress of his civil actions.  (Doc. 29-2.)

Asserting an actionable claim for denial of access to the courts requires a prisoner to allege that (1) they "lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim" and (2) they have no available remedy for the lost claim other than the present denial of access action.  *Rivera v. Monko*, 37 F.4th 909, 915 (3rd Cir. 2022) (citing *Monroe v. Beard*, 536 F.3d 198, 205 (3rd Cir. 2008)).  Most significant is the nonfrivolous nature of the claim allegedly lost.  The lost claim must be "more than hope" in order to be deemed nonfrivolous.  *Christopher v. Harbury*, 536 U.S. 403, 416 (2002).

Plaintiff alleges that upon his initial arrival to SCI-Camp Hill, Defendant Dickey took an initial draft of a civil rights compliant, Defendant CC Miller took the second draft of the same civil rights complaint, and Defendant U/M Miller took supporting documents for a civil rights action.  (Doc. 29-2, pp. 8–11.)  However, he does not allege that these confiscations precluded him from pursuing his civil action.  In fact, he specifically alleges that he was able to file the case.  (*Id*., pp.

13–14.)  Therefore, any implied access to court claim associated with these alleged facts is dismissed with prejudice.

The second factual scenario concerning the confiscation of legal property involves the confiscation of three boxes of legal property that Plaintiff asserts he had the right to maintain with a legal property exemption.  (*Id.*, pp. 32–50.) Specifically, Plaintiff alleges that Defendants Dickey, U/M Miller, Alvord, Benning, and Harry were involved with the confiscation of three boxes of legal property that resulted in unfavorable court rulings in a civil action and at least nine requests for an enlargement of time.  (*Id.*)  However, a vague reference to "unfavorable court rulings" does not meet the requirement set forth by the Third Circuit in *Rivera*.  Instead, Plaintiff would be required to plead that he has no available remedy for the lost claim other than this denial of access action.  *Rivera*, 37 F.4th at 915.  Therefore, any potential First Amendment access to court claim associated with the second alleged confiscation of property will be dismissed without prejudice.

### 2.  First Amendment Retaliation Claims

As discussed above, Plaintiff generally raised retaliation claims against multiple defendants which could pertain to the loss of Z-Code status or the confiscation of property.  (Doc. 29-2, p. 53.)  The court will now address the

retaliation claims against Defendants Dickey, U/M Miller, Benning, Alvord, Harry, and the DOC.

Plaintiff alleges that Defendants Dickey, U/M Miller, Benning, Alvord, and Harry were personally involved in the confiscation of his property.  (Doc. 29-2.) Additionally, Plaintiff has alleged the filing of civil actions and/or grievances against Defendants Dickey, U/M Miller, Benning, Alvord, and Harry.  (*Id.*) Therefore, the retaliation claims against these five persons will survive screening.

All retaliation claims against the DOC will be dismissed with prejudice because, as discussed at length above, the DOC is not a "person" within the meaning of 42 U.S.C. § 1983.

### 3.  Fourteenth Amendment Claims

Plaintiff does specifically raise a due process claim under the Fourteenth Amendment premised on the confiscation of his legal property against Defendants Dickey, U/M Miller, CC Miller, Alvord, Benning, Harry, and DOC.  (Doc. 29-2, p. 54.)

The Fourteenth Amendment provides, in pertinent part, that no State shall "deprive any person of life, liberty, or property, without due process of law[.]"  *See* U.S. Const. amend. XIV.   However, "[d]eprivation of inmate property by prison officials does not give rise to cognizable due process claim if the prisoner has an adequate post-deprivation state remedy."  *Crosby v. Piazza*, 465 F. App'x 168, 172

(3d Cir. 2012) (citing *Hudson v. Palmer,* 468 U.S. 517, 533 (1984)).  Adequate

remedies were available here as Plaintiff was provided an opportunity to file an

administrative grievance or seek damages in state court.[3]  *See Tillman v. Lebanon*

*County Corr.,* 221 F.3d 410, 422 (3d Cir. 2000).  To the that extent Plaintiff is

dissatisfied with the outcome of the administrative process, he may still file a state

court tort action.  *Hudson,* 468 U.S. at 535.  Therefore, the due process claims

associated with the alleged deprivation of property will be dismissed with

prejudice.

### 4.    Conspiracy

Plaintiff raises a conspiracy to deprive of noncontraband personal property

claim against Defendants Dickey, CC Miller, U/M Miller, Alvord, Benning, Harry

and the DOC under 42 U.S.C. § 1983.  (Doc. 29-2, p. 55.)  However, since the

deprivation of property from Plaintiff does not violate the Fourteenth Amendment,

the conspiracy claim will be dismissed with prejudice.

### D. State Tort Claims

Plaintiff also brings a negligence claim against Defendants U/M Miller, CC

Miller, and Howdyshell asserting a "breach of duty to exercise ordinary and

reasonable care for the preservation of health and safety," and a claim for

---

[3] See 42 Pa. C.S. § 8522(b)(3).

intentional infliction of emotional distress against all named Defendants.  (Doc. 29-2, p. 56.)

When a plaintiff alleges federal law claims that fall within this court's original jurisdiction pursuant to 28 U.S.C. § 1331, the court may exercise supplemental jurisdiction over Plaintiff's state law causes of action pursuant to 28 U.S.C. § 1367.  Section 1367 provides in pertinent part that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Considering some of the First Amendment retaliation claims and the Eighth Amendment deliberate indifference claims will survive the court's screening of the amended complaint, the court will exercise supplemental jurisdiction and allow the state tort law claims to proceed.

## CONCLUSION

For the above stated reasons, the court will grant Plaintiff's motion to amend his complaint, deny the pending motions to dismiss as moot, and screen the complaint pursuant to 28 U.S.C. § 1915(e).  The court will dismiss the First Amendment retaliation claim against the DOC with prejudice.  The remaining First Amendment retaliations claims will proceed.  The court will dismiss the Eighth

Amendment deliberate indifference claims against Defendant Kehoe and the DOC with prejudice.  Likewise, it will dismiss the Eighth Amendment deliberate indifference claims against Defendants Little, Harry, and Dickey without prejudice.  The remaining Eighth Amendment deliberate indifferent claims will proceed. The Fourteenth Amendment claims based on the loss of Plaintiff's Z-Code status will be dismissed with prejudice.  Likewise, the conspiracy to take Plaintiff's Z-Code status claims will be dismissed with prejudice.  Plaintiff's First Amendment access to court claim associated with the loss of legal property following his transfer from SCI-Forest to SCI-Camp Hill will be dismissed with prejudice.  The First Amendment access to court claim associated with the confiscation of legal boxes at SCI-Camp Hill will be dismissed without prejudice. The First Amendment retaliation claim associated with the loss of legal property will be allowed to proceed.  The Fourteenth Amendment claim associated with the loss of legal property will be dismissed with prejudice. Likewise, the conspiracy to take Plaintiff's legal property claim is dismissed with prejudice.  The state tort claims will proceed.

In accord with the Third Circuit's ruling in *Phillips*, the court will grant Plaintiff a single opportunity to cure the defects identified in this memorandum by filing a second amended complaint.  This amended pleading shall be titled the "Second Amendment Complaint" and filed under the same case number.  Plaintiff

has a history of filing large complex complaints that attempt to raise claims concerning multiple events and occurrences. *See Grazianno v. Wetzel*, No. 1:23-CV-00947-JPW-EW (M.D. Pa.). Therefore, any second amended complaint is limited to the occurrences alleged in this amended complaint. If Plaintiff raises claims concerning any other factual scenarios, such claims will be dismissed pursuant to Fed. R. Civ. P. 20. Any second amended complaint must be "complete in itself including exhibits." L.R. 15.1(a). Therefore, any second amended complaint must raise all the claims that have been allowed to proceed in this action and cure the pleading defects of the claims that were dismissed without prejudice. Additionally, if a claim has been dismissed with prejudice, it cannot be realleged in a second amended complaint.

An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: September 18, 2025